DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@holdenlegal.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@holdenlegal.com
HOLDEN KIDWELL HAHN & CRAPO, P.L.L.C.
P.O. Box 50130
1000 Riverwalk Drive, Suite 200
Idaho Falls, ID 83405
Telephone: (208) 523-0620
Facsimile: (208) 523-9518

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| A. RICHARD ("RICK") WHITE,<br><br>Plaintiff,<br>v.<br><br>POCATELLO HOSPITAL, LLC d/b/a/ PORTNEUF MEDICAL CENTER; LHP POCATELLO, LLC,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee:    $400.00 |

Plaintiff, A. Richard ('Rick") White, by and through counsel of record, Holden, Kidwell, Hahn & Crapo, P.L.L.C., for cause of action against Defendants Pocatello Hospital, LLC d/b/a Portneuf Medical Center; and LHP Pocatello, LLC alleges and complains as follows:

**JURISDICTION AND VENUE**

1. This is an action brought pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*; Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*; and the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1343(4) and 1367; 29 U.S.C. § 621, *et seq.*; and 29 U.S.C. § 1001, *et seq.*

3.  This action properly lies in the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) inasmuch as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

4.  Plaintiff A. Richard ("Rick") White ("White") realleges and incorporates by reference paragraphs 1 through 3 as though fully set forth herein.

5.  White is a male citizen and resident of the United States of America, who is, and at all times relevant hereto was, a resident of Bannock County, Idaho.

6.  Pocatello Hospital, LLC d/b/a Portneuf Medical Center ("Hospital") is a Delaware limited liability company, authorized to do business in Idaho and has its principal place of business in Bannock County, Idaho.

7.  LHP Pocatello, LLC is a Delaware limited liability company, authorized to do business in Idaho and is the parent company of the Hospital.

8.  At all times material to this Complaint, Defendants regularly employed twenty or more persons, and were engaged in an industry affecting commerce, bringing Defendants within the ambit of 29 U.S.C. § 621, *et seq.*; and 29 U.S.C. § 1002 *et seq.*

## FACTS COMMON TO ALL COUNTS

9.  White realleges and incorporates by reference paragraphs 1 through 8 as though fully set forth herein.

10. In or about 1995, White began working for the Hospital, located in Pocatello, Idaho as a CNA, SNAP. In 2000, he became an RN. At the time, the Hospital was owned by Bannock County and known as Bannock Memorial Hospital. Because of White's long-tern employment he had benefits grandfathered to him as the ownership of the Hospital changed.

11.  White continued to work for the Hospital until July 12, 2016, when the Hospital terminated White's employment.

12.  White is one of only a few male nurses on staff.

13.  Prior to his termination, White had only been disciplined once over the course of his employment with Hospital. The discipline occurred after he was accused of completing the NDNQI Skin module education and test for another RN.

14.  White did not take the test for the other RN, but assisted her in submitting it to print because the other nurse was unable to get it to print. White disputes the basis of the discipline.

15.  On or about June 20, 2016, White attended an AIDET meeting at the Hospital. Natalie Snow ("Snow"), White's acting supervisor and the Hospital's Chief Nursing Officer, conducted the meeting.

16.  White's supervisor, Lance Howell, also one of the few male nurses, was out on FMLA leave and fired shortly after his return.

17.  Nine people, including White and Snow, attended the meeting.

18.  Toward the end of the meeting, Snow opened it up to questions or concerns, asking the employees to give input. The conversation became heated as it turned to the market value wage adjustments the Hospital was making and other compensation adjustment that the Hospital had recently put into effect. The older RNs who had long-term employment at the Hospital were severely disadvantaged in the compensations changes.

19.  Because White was an older, male employee with long-term employment the Hospital, employees often looked to him to address concerns in the workplace.

20.  At some point the discussion turned to the reduction in compensation as paid time off ("PTO"), at which point White spoke up and said, "Natalie, since I am a night worker, there

is only one of these changes that truly affects me and that is the change or lowering of my PTO. I have had two decreases in PTO since LHP took over, first from ten hours per pay period to nine hours per pay period, and now down to eight hours per pay period. This cut hurts and it's burning and I'm out of Anusol."

21. White was particularly concerned how the market compensation changes affected older employees like himself.

22. At that point Snow, White, and the seven other employees laughed at the obvious joke and attempt at humor.

23. When the laughter calmed down, Snow said she did not know what Anusol was. Steve Silcock, another RN, then said it is a medication used for hemorrhoids.

24. The conversation returned to the market compensation changes and nothing more was said regarding White's comment.

25. After the meeting, White approached Snow as she was gathering her belongings and stated that he knew she had a hard job. He said directors and managers are great buffers because they keep the administrative problems from affecting the employees and they keep the employee issues from overwhelming the administration.

26. Snow said that she would take the concerns expressed during the meeting to the administration but could not make any promises.

27. White thanked Snow, and then, in jest, referring again to the Anusol, said, "If you need it, I could get you a case."

28. Later that same day, Snow contacted White to set up a meeting to discuss the comments he made during the meeting. They set June 22, 2016 as the meeting date.

29. White met with Snow and Drew Burk ("Burk"), the Director of Human Resources at the Hospital at about 2:30 p.m. on June 22, 2016.

30. White was surprised to see Burk at the meeting. White was on edge as a result, because prior to that moment, White did not think he had done anything wrong.

31. Snow began the meeting by stating that they would like to talk about the comments White made during the meeting. White asked which comments because he made multiple comments about staffing issues. Snow then said she and Burk would like to talk about White's comment about the Anusol. White then repeated his comment from the prior meeting. At that point, Snow described White's comment as including a statement that the ER was taking it up the ass.

32. White denied ever making that comment or saying anything like it, and then he restated his prior comment as before. White also said he did not know where Snow heard that comment because he did not hear it at the meeting. White said Steve Silcock was the only other person to address White's comment and that was to explain what Anusol is used for. After denying several times the comment Snow accused White of making, Snow and Burk excused White from the room and asked him to wait outside.

33. After waiting outside the room for approximately and hour, they invited White back in the room and told him they called Steve Silcock to ask what he remembered from the meeting. They told White that Steve Silcock did not remember White or anyone else making the "up the ass" comment or anything like it. Snow stated she was certain White made the comment and that she is a "very visual listener" and the she often envisions what she is hearing.

34. Burk told White he wanted to conduct an investigation. Snow and Burk said they would conduct the investigation as quickly as possible and warned White not to speak with anyone so as to not interfere with the investigation.

35. That evening, after arriving home, White discovered that his wife, Monica White, who is the Director of Volunteer Services at the Hospital, received an email from her boss, Todd Blackington ("Blackington"), the Hospital's Director of Marketing, stating how sorry he was that White had been fired and that her husband's firing would have no effect on her job at the Hospital. Blackington said in his email that Burk stopped by his office before Blackington left at noon for a business trip. The timing indicates Burk told Blackington that White was going to be fired prior to meeting with White at 2:30 pm and prior to conducting any investigation.

36. On July 11, 2106, Snow called White to set up a meeting for the following day. They met at 9:00 a.m. Dean Stuart and White's wife, Monica, accompanied White to the meeting. Heather Wright ("Wright") from Human Resources was present with Snow. Wright asked Monica to wait outside as it was against company policy to allow family members to attend meetings of that nature. Once the meeting began, Snow presented White with the Employee Counseling Report ("Report"), which contained the reasons for White's termination.

37. Both Dean Stuart and White read the Report. White then denied making the comments Snow accused him of making in the Report. White asked Snow to correct the report to accurately reflect the comments he made, and to accurately reflect what happened in 2013 when he was previously disciplined. Snow refused to make any changes and asked White to sign the termination letter, which White refused to do until Snow corrected it.

38. Snow and Wright then asked Dean Stuart to sign as a witness. He refused to sign as well. Wright then signed as a witness. White then asked about rehire and was told it would be up to each unit's department director at the time of application.

39. Medical related humor is commonplace in hospital settings, and was even encouraged by the Hospital. During the 2016 Nurses' Week at the Hospital, the predominantly female nursing staff from the various departments of the Hospital were encouraged to create and submit a poster template for department t-shirts. The posters were displayed for two weeks in the Hospital cafeteria, which is open to the public. The Hospital displayed a poster the radiology department submitted that read, "Interventional Radiology... More than just Fifty Shades of Gray!" The Hospital also displayed a poster the nurses from the urology department submitted that read, "'Urine' good hands." And the Hospital displayed a poster submitted by the nurses in the labor and delivery department that read, "Always At Your Cervix."

40. On July 12, 2016, the day after his termination, White submitted a grievance with the Hospital, setting forth how he was being treated in comparison to others and in retaliation for his comments.

41. On October 10, 2017, the Hospital terminated Snow's employment.

42. Based on information and belief, White was replaced with a younger, female employee.

43. On or about April 26, 2017, White filed a charge of discrimination with the EEOC.

44. The EEOC issued White a Notice of Right to Sue letter on December 20, 2017.

## COUNT ONE
## VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT
**(Age Discrimination)**

45. White incorporates by reference each and every allegation set forth in paragraphs 1 through 44 as though fully set forth herein.

46. Defendants terminated White's employment.

47. White was over 40 years of age at the time of termination.

48. White was performing his job satisfactorily.

49. Based on information and belief, Defendants replaced White with someone who was substantially younger and less qualified than White and/or treated other individuals who were significantly younger and less qualified than White more favorably than White.

50. Defendant terminated White's employment because of his age, which was evident by his long-term employment with the Hospital.

51. As a direct and proximate result of Defendants' actions and/or failures to act, White has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. White is thereby entitled to damages in an amount to be proven at trial.

52. Defendants' conduct was willful, and done with a reckless disregard for White's federally protected rights, for which White is entitled to liquidated damages pursuant to 29 U.S.C. § 626(b).

## COUNT TWO
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Gender Discrimination)

53. White incorporates by reference each and every allegation set forth in paragraphs 1 through 52 as though fully set forth herein.

54. White is a male and therefore belongs to a protected class under Title VII of the Civil Rights Act of 1964.

55. White suffered an adverse employment action when the Hospital terminated his employment.

56. White was treated differently than his similarly-situated female employees.

57. As a direct and proximate result of the Hospital's actions and failures to act, White has suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation, based upon the gender discrimination he experienced. Further, White has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. White is thereby entitled to general and compensatory damages in such amount to be proven at trial, as well as other equitable remedies available to him.

## COUNT THREE
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
(Gender – Plus Age Discrimination)

58. White incorporates by reference each and every allegation set forth in paragraphs 1 through 57 as though fully set forth herein.

59. White is a man over the age of 40, a protected subclass of employees under Title VII.

60. White was treated differently than his similarly-situated older female employees.

61. As a direct and proximate result of the Hospital's actions and failures to act, White has suffered and will continue to suffer emotional distress consisting of outrage, shock and humiliation, based upon the gender discretion he experienced. Further, White has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. White is thereby entitled to general and compensatory damages in such amount to be proven at trial, as well as other equitable remedies available to him.

## COUNT FOUR
## UNLAWFUL RETALIATION: FLSA

62. White realleges and incorporates by reference paragraphs 1 through 61 as though fully set forth herein.

63. Defendants implemented a compensation policy that benefitted workers younger than 40 at the expense of workers over the age of 40.

64. White opposed Defendants' unlawful activity by speaking out against it at the AIDET meeting in June, 2016.

65. Within weeks of White's opposition, Defendants terminated White as a direct and proximate result of his opposition to their unlawful activity.

66. As a direct and proximate result of Defendants' actions and/or failures to act, White has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. White is thereby entitled to damages in such amount to be proven at trial.

## COUNT FIVE
## UNLAWFUL RETALIATION: ERISA

67. White realleges and incorporates by reference paragraphs 1 through 66 as though fully set forth herein.

68. As a benefit of his employment with Defendants, White was entitled to paid time off ("PTO") benefits that were grandfathered to him and governed by ERISA.

69. White engaged in protected activity by objecting to the Hospital's interference with his PTO benefits by reducing his accrual.

70. Defendants intentionally sought to interfere with White's accrual or use of PTO by terminating White's employment with Defendants, and retaliating against him for his protected activity.

71. As a direct and proximate result of Defendants' actions and/or failures to act, White has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. White is thereby entitled to general and compensatory damages in such amount to be proven at trial as well as any other equitable remedies available to him.

72. Defendants' conduct was malicious and oppressive, and done with reckless disregard for White's federally protected rights for which White is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## ATTORNEY'S FEES

73. As a further and direct result of Defendants' actions and/or failures to act, White has been compelled to retain the services of counsel, and thereby incurred, and will continue to incur, costs, expert witness fees, and attorney fees, which should be paid by Defendants pursuant to 29 U.S.C. § 216(b); 29 U.S.C. § 1132(g); and 42 U.S.C. § 2000e-5(k), *et seq.*

## DEMAND FOR JURY TRIAL

White demands trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

Wherefore, White seeks judgment against Defendants as follows:

1. For damages in an amount as shall be proven at trial;
2. For liquidated damages in an amount as shall be proven at trial;
3. For punitive damages in an amount as shall be proven at trial;
4. For attorney's fees pursuant to statute and costs of suit;
5. For prejudgment interest on all amounts claimed; and
6. For such other and further relief as the Court deems just and proper.

DATED this 16th day March, 2018.

        /s/
DeAnne Casperson, Esq.
HOLDEN, KIDWELL, HAHN & CRAPO, P.L.L.C.

G:\WPDATA\DC\19550 White\Pleadings\Complaint.wpd